**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES EATON and IRMA JEANETTE LOPEZ, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>PEPSICO, INC.; and WALMART INC.,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs James Eaton and Irma Jeanette Lopez ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against PepsiCo, Inc. ("Pepsi") and Walmart Inc. ("Walmart") (collectively, "Defendants"), pursuant to Rule 23 of the Federal Rules of Civil Procedure, for violating federal antitrust law and state antitrust and consumer protection laws.

## I.    INTRODUCTION

1.    This case alleges a pricing pact between one of the largest beverage and packaged food companies in the world, Pepsi, and the largest retailer globally, Walmart. Since at least 2018, the two companies have acted in concert to restrain competition for Pepsi soft drinks at both the wholesale and retail tiers. Their coordinated conduct allowed each to impose prices that exceeded competitive benchmarks and ensured that wholesale and retail prices for Pepsi bottled soft drinks remained above levels that would exist in a competitive market (the "Pact" or "Pricing Pact").

2.    The Pact functioned through two interdependent strategies. First, Pepsi undertook to influence pricing behavior at retailers competing with Walmart. Retailers selling Pepsi soft drinks were required to price those products at or above Walmart's shelf price. When competitors failed to comply voluntarily, Pepsi imposed escalating and targeted wholesale price increases until

1

selling below Walmart became economically untenable. By suppressing discounting among rival retailers, Pepsi enabled Walmart to maintain elevated prices while preserving its public reputation for price leadership.

3.      The second component flowed in the opposite direction. In exchange for Pepsi's enforcement of retail price discipline across the market, Walmart agreed to tolerate higher wholesale prices from Pepsi. Absent those retail restraints, Walmart would have exercised its purchasing leverage to demand wholesale concessions necessary to compete at lower retail price points without sacrificing margins. Indeed, when Pepsi did not sufficiently constrain competitors' pricing, Walmart pressed for reduced wholesale pricing. But once Pepsi took steps to elevate market-wide retail prices, Walmart ceased demanding such concessions and instead accepted the increased wholesale costs.

4.      Taken together, the Pact consisted of reciprocal commitments: Pepsi would raise and protect retail price levels across non-Walmart outlets, and Walmart would accept higher wholesale pricing from Pepsi. Those combined commitments form the basis of the unlawful conduct alleged here.

5.      This coordination occurred within a soft drink industry marked by high concentration and substantial market power. Pepsi, Coca-Cola, and Dr. Pepper together account for approximately 93 percent of sales. In markets structured this way, price increases initiated by a dominant firm often trigger similar moves by rivals. A retail price-fixing understanding such as the one alleged here can both reinforce and accelerate such coordinated pricing dynamics.

6.      The competitive consequences were significant. At the retail level, intra-brand competition for Pepsi soft drinks was curtailed. Lower-cost or lower-margin retailers were

prevented from offering consumers better prices than Walmart. Consumers consequently faced inflated retail prices not only at competing stores, but at Walmart itself.

7. At the wholesale level, competition among beverage manufacturers was likewise impaired. By insulating Pepsi from pressure by Walmart and other major retailers to reduce wholesale pricing, the Pricing Pact diminished incentives to compete aggressively on price. Pepsi maintained higher wholesale prices than would otherwise have prevailed. The resulting environment also dampened competitive pressure between Pepsi and its principal rivals—Coca-Cola and Dr. Pepper—further strengthening Pepsi's market position. Those elevated wholesale costs were ultimately borne by consumers through higher retail prices.

8. Walmart's conduct with Pepsi was not anomalous. The company has employed comparable tactics with other leading suppliers. As the largest retailer—and often the most significant customer for major manufacturers—Walmart has required suppliers to monitor and adjust competitors' retail pricing in ways that protect Walmart's market position. For example, during the same period in which Pepsi agreed to safeguard Walmart's price leadership, Energizer Holdings, Inc. entered into a substantially similar understanding at Walmart's insistence.[1] Energizer committed to imposing targeted wholesale increases on retailers whose prices undercut Walmart, thereby pressuring those retailers to revise their pricing and avoid Walmart's scrutiny.

9. In litigation challenging Walmart's Pact with Energizer, a federal district court rejected a motion to dismiss and observed that such conduct would make little economic sense absent coordination.[2] A supplier acting independently would ordinarily seek to promote lower

---

[1] *See* Complaint, *Portable Power, Inc. v. Energizer Holdings, Inc.*, No. 5:23-cv-02087 (N.D. Cal. Apr. 28, 2023), ECF No. 1.

[2] *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024).

retail prices in order to drive sales volume and maximize profits at a given wholesale price. Pepsi's willingness to accept reduced sales volume through elevated retail pricing instead reflected a shared economic objective with Walmart and a mutual expectation of benefit from their coordinated actions.

10.     Pepsi's internal communications confirm the existence of that shared understanding. In discussing targeted wholesale price increases imposed on retailers charging less than Walmart, Pepsi emphasized the need to "close the gap" at retail in order to demonstrate near-term progress to Walmart. Energizer's internal statements regarding its own pact echoed the same motive, acknowledging that its pricing actions were driven entirely by Walmart's expectations regarding price positioning.

11.     The parallel commitments made by Pepsi and Energizer illustrate that Pepsi's conduct was neither isolated nor the product of unilateral business judgment. Rather, it reflects a broader pattern in which Walmart collaborates with key suppliers to maintain the appearance of price leadership while suppressing genuine price competition.

12.     Consumers paid the price for this Pact. As a direct result of the coordinated conduct described above, Plaintiffs and other purchasers paid more for Pepsi soft drinks than they would have in a competitive marketplace.

13.     The Pact began no later than January 1, 2018 and has persisted through the present (the "Relevant Time Period").

14.     Plaintiffs bring this action individually and on behalf of an indirect purchaser class comprised of all persons and entities residing in Kansas and Alabama, and in all other states that have repealed the Illinois Brick bar, who purchased Pepsi soft drinks during the period beginning January 1, 2018 and continuing through at least the date of the filing of this Complaint (the "Class

Period"). Plaintiff seeks injunctive relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and pursue treble damages under applicable federal and state antitrust and consumer protection statutes.

## II.    THE PARTIES

### A.    Plaintiffs

15.    James Eaton is a resident of Olathe, Johnson County, Kansas and is a citizen of the United States. Throughout the Class Period, Mr. Eaton has purchased Pepsi soft drinks in Kansas at Hy-Vee grocery stores for his own personal, family and household use and not for resale. Mr. Eaton has paid supra-competitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

16.    Irma Jeanette Lopez is a resident of Franklin County, Alabama and is a citizen of the United States. Throughout the Class Period, Ms. Lopez has purchased Pepsi soft drinks in Alabama at Dollar General grocery stores for her own personal, family and household use and not for resale. Ms. Lopez has paid supra-competitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

### B.    Defendants

17.    PepsiCo, Inc. ("Pepsi") is a multinational producer of beverages and packaged food products with its principal place of business in Harrison, New York. It ranks among the dominant firms in the global food and beverage industry.

18.    Walmart Inc. ("Walmart"), headquartered in Bentonville, Arkansas, operates thousands of retail locations across the United States and generates more revenue than any other company worldwide.

### III.    JURISDICTION AND VENUE

19.    Plaintiffs bring this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against the Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring state law class claims on behalf of the multistate damages class to recover actual and/or compensatory damages, double- and treble-damages as permitted by relevant state laws, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' anticompetitive conduct, which resulted in prices for Pepsi soft drinks being artificially inflated at supracompetitive levels throughout the Relevant Time Period.

20.    This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Section 16 of the Clayton Act (15 U.S.C. § 26).

21.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the Class; and at least one member of the Class is a citizen of a state different from that of one of the Defendants.

22.    Venue is proper in this District pursuant to Sections 12 and 16 of the Clayton Act (28 U.S.C. §§ 22 and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and/or a substantial portion of the interstate trade and commerce affected by the conspiracy described therein was carried out in this District. Specifically, Defendant Pepsi is headquartered in this District, and it has sold its soft drinks to both Walmart and many other retailers within this District. Defendant Walmart operates retail stores within this

District, and it has purchased and sold Pepsi soft drinks at stores within this District. In addition, Defendants have directed their unlawful conduct towards retailers located in this District.

23.    This Court has personal jurisdiction over Defendants. During the Class Period, Defendants marketed and sold Pepsi soft drinks in this District and have had substantial contacts within this District in furtherance of the anticompetitive activity alleged herein.

## IV.    FACTUAL ALLEGATIONS

### *Pepsi's Position in the Soft Drink Market*

32.    The U.S. market for bottled soft drinks is enormous—generating approximately $150 billion each year—and Pepsi is one of the two central suppliers. Only Coca-Cola is larger. Pepsi's North American soft drink business is operated through PepsiCo Beverages North America ("PBNA"), which oversees U.S. and Canadian operations and reported $27.6 billion in revenue in 2023. Pepsi's major brands include Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks.

33.    Pepsi reaches consumers through retailers in virtually every major channel— grocery, drug, convenience, discount/dollar, mass merchandise, and membership clubs—and those retailers compete with each other both within and across channels to sell soft drinks. Retailers typically purchase Pepsi products from Pepsi bottlers and then set retail prices to compete for consumer demand.

34.    Pepsi supplies retailers through a national network that includes wholly owned bottlers and franchise bottlers. Where bottlers are wholly owned, Pepsi sets the wholesale prices charged to retailers. This structure supports Pepsi's ability to manage price and availability at scale.

35.    Pepsi's position is reinforced by industry concentration. Pepsi controls nearly one-third of U.S. bottled soft drink sales. Its only substantial rivals are Coca-Cola, and—more

distantly—Dr. Pepper. Collectively, those three firms account for over 90% of U.S. carbonated soft drink sales.

36.     Entry barriers are high and help preserve that market structure. One of the most visible barriers is advertising and brand equity. For more than half a century, Pepsi and Coca-Cola have competed through the widely known "Cola Wars," using sustained, targeted advertising to build consumer loyalty. Pepsi spends more than $3 billion annually on advertising and has achieved near-universal brand recognition. Many retailers treat Pepsi products as must-carry; those that do not stock them face competitive disadvantages.

37.     Distribution infrastructure creates an additional—and independently formidable—barrier. Pepsi, Coca-Cola, and Dr Pepper rely on bottling systems built over more than a century, combining company-owned and independent bottlers. Independent bottlers often operate under exclusive territorial Pacts to manufacture and distribute products. Pepsi also uses its Direct-Store-Delivery logistics system to move products directly from bottlers to retailers nationwide. Without comparable bottler access, new entrants cannot match incumbents' national reach or economies of scale; and access to bottlers itself depends on the demand generated by expensive, durable investments in brand equity. The bottlers' pivotal role—and the scale needed to participate—operates as a substantial barrier to entry for smaller would-be competitors.

### *Walmart's Retail Dominance*

38.     Walmart sits at the center of U.S. soft drink retail market. It operates more than 4,700 stores across all states and in nearly every metropolitan area. Walmart estimates that about 90% of Americans live within ten miles of a Walmart, giving it an unmatched footprint for soft drink distribution.

39.    That reach translates into buyer power: suppliers depend on Walmart because many Walmart shoppers purchase a full basket of household goods and are unlikely to buy soft drinks elsewhere. Losing Walmart therefore risks losing those consumers altogether. Pepsi's own public disclosures underscore Walmart's importance. In its 2024 Form 10-K, Pepsi identifies Walmart as its most important customer and reports that sales to Walmart and its affiliates (including Sam's Club) represented approximately 14% of Pepsi's consolidated net revenue, warning that the loss of Walmart would have a material adverse effect on Pepsi's North America divisions.

40.    Pepsi responded to that dependence by granting significant concessions aimed at preserving Walmart's preferred market positioning. One such concession is maintaining a retail pricing advantage for Walmart—often described as a "price gap" or "price hedge"—so Walmart's prices appear lower than competitors' prices on Pepsi soft drinks. Pepsi and Walmart have worked to maintain this price gap since at least 2018, giving Walmart a competitive advantage in retail sales of Pepsi soft drinks.

41.    Pepsi's internal materials describe maintaining Walmart's price gap—what Walmart calls retail "price leadership"—as a core, ongoing obligation. Pepsi documents characterize this as a foundational commitment and an aligned strategy; internal communications emphasize that focusing on Walmart deliverables and gap commitments is how Pepsi "wins with Walmart."

42.    To track whether Walmart is receiving the expected advantage, Pepsi monitors Walmart's pricing against the rest of the market, a comparator group consisting of multi-outlet or multi-channel stores in the grocery, club, drug, and dollar channels (excluding Walmart). Pepsi uses two principal measurements: a volume-weighted "price gap" metric comparing average Walmart prices to other retailers over a given timeframe, and an unweighted "value hedge" metric

measuring the percentage difference between Walmart's average retail price and other retailers' prices.

43.     Pepsi also tracks whether Walmart loses sales when competitors price lower. Pepsi leadership describes this as "leakage," meaning the percentage of consumers shifting away from Walmart to buy at another retailer. Pepsi observed in early 2023 that erosion of the price gap corresponded with higher conversion/leakage—primarily into grocery, club, and dollar channels—and that Walmart tends to lose the most share where it is least competitive on price.

44.     Walmart monitors the same issue from its side. Walmart and Pepsi communicated frequently—both short-term and long-term—about whether Pepsi was meeting Walmart's price-gap expectations. Pepsi attempted to manage gap expectations over longer windows (annual or semiannual) while treating monthly and quarterly results as leading indicators of friction. Walmart buyers received price-gap reports in advance of meetings with Pepsi executives and discussed how to address specific gaps.

45.     When those reports showed Walmart losing its preferred position, Walmart's dissatisfaction was explicit. Walmart expected prompt, concrete action directed at the particular retailers it viewed as undercutting Walmart.

46.     For example, in 2019 Pepsi identified a competing retailer repeatedly pricing twelve-pack Pepsi products aggressively below Walmart. Pepsi executives anticipated Walmart would react sharply once the pricing appeared on the upcoming price-gap report and would demand action, especially given the proximity of the report to a scheduled meeting with Walmart's senior buyer.

47.     In another instance, in October 2020, Walmart's senior beverage buyer complained to Pepsi about a Target promotion discounting Bubly eight-packs, stating that Pepsi was

undermining Walmart's price leadership. Pepsi responded by emphasizing the importance of price leadership and asserting that Walmart remained advantaged on Bubly relative to the rest of the market and Target.

48.    Walmart's response to discounting by competitors was not limited to complaints. When price-gap performance was "out of balance," Pepsi executives recognized Walmart would pressure Pepsi for corrective measures. Those measures were aimed at changing competitor behavior—not Walmart lowering its own prices.

49.    The competitive-market alternative would have been straightforward: Walmart would match lower retail prices, and—if it wanted to protect margins—would demand corresponding wholesale reductions from Pepsi. This dynamic occurred when Walmart imposed forced Rollbacks (described below), demonstrating Walmart's ability to compel concessions.

50.    Instead of competing downward at Walmart, Pepsi and Walmart reached a reciprocal understanding—the pricing Pact—to use their combined leverage to push rivals' prices upward. Under the Pact, Walmart would refrain from lowering its own retail prices (and thereby avoid triggering wholesale price cuts), while Pepsi would identify and discipline "offending" retailers whose sustained discounting threatened Walmart's preferred price advantage.

51.    Pepsi's internal materials frame the issue as a choice between raising rivals or lowering Walmart. In 2021, Pepsi's Pricing Council evaluated a "price gap risk" driven by grocery chains "battling" for share by cutting Pepsi retail prices. The Council presented a two-path decision structure: (1) raise non-Walmart customers to prevent price risk, or (2) "manage" Walmart's hedge by reducing Walmart wholesale and retail pricing.

52.    Where Pepsi believed it was feasible, it pursued the first path: moving competitors' retail pricing up to restore Walmart's hedge. A prominent example involved Food Lion, a regional

chain with over 1,000 stores in 10 states. In 2022, Pepsi identified Food Lion as indexing retail prices against Walmart and Kroger and setting prices relative to those competitors. Pepsi labeled Food Lion the "worst offender" for "beating" Walmart's price position. Pepsi developed a multi-year plan to raise Food Lion's retail prices, expressly stating it needed to raise Food Lion's rate faster than the market. The plan combined targeted wholesale increases on core packages with tightened promotional support—shortened holiday promotions, increased promotional prices, and reduced simultaneous promotions—until Food Lion's sale of Pepsi products at sub-Walmart prices became unprofitable, leaving Food Lion to raise shelf prices.

53.    Pepsi tied these actions directly to Walmart expectations. Pepsi leadership urged the Food Lion team to close the retail-price gap and emphasized that measurable progress needed to be demonstrated to Walmart immediately.

54.    Walmart sought similar commitments from other suppliers, illustrating that the Pricing Pact was consistent with a broader pattern rather than isolated conduct by Pepsi. Energizer is an example: A supplier in another concentrated industry allegedly imposed targeted wholesale increases on a retailer pricing below Walmart in order to force the retailer to revise pricing and get "off Walmart's radar," and stated explicitly that the effort was driven by Walmart's demand for the best price. Pepsi's and Energizer's similar commitments reflect Walmart's practice of claiming "price leadership" without engaging in genuine price competition.

### *The Defendants' Conspiracy*

55.    The Pricing Pact functioned as a bargain: If Pepsi succeeded in lifting competitor pricing, Walmart could preserve higher retail prices without matching cheaper rivals, and Pepsi could preserve higher wholesale prices without subsidizing lower retail prices in the market.

56.     When Pepsi did not deliver sufficient progress in raising rivals' retail prices, Walmart reverted to buyer-power tactics that produce actual price competition—demanding wholesale concessions so Walmart could lower retail prices without losing margin.

57.     Walmart implemented these concessions through forced Rollback promotions. A Rollback is an advertised Walmart price reduction funded in whole or in part by the manufacturer. Manufacturers sometimes choose Rollbacks unilaterally to drive volume, share, and longer-term profitability at key times (such as holidays).

58.     The relevant Rollbacks were different: They were used as punishment and leverage when competitor prices remained low. Rather than proposing a mutually beneficial promotion, Walmart required Pepsi to fund Rollbacks so Walmart could match competing retail prices while maintaining Walmart's margin. These compelled Rollbacks operated in substance as wholesale price cuts subsidizing lower retail prices. Pepsi allegedly agreed because refusal risked losing Walmart, and Pepsi's SEC filings acknowledge that losing Walmart would have a material adverse effect.

59.     Pepsi's internal communications demonstrate reluctance. For example, in 2019— before meeting with Walmart's senior buyer and anticipating negative reaction to competitor discounting in the price-gap report—a Pepsi executive wrote that a planned Walmart Rollback seemed unavoidable to combat the impending price-gap challenge.

60.     Pepsi attempted Rollbacks only after concluding it could not raise competitor pricing quickly enough. In December 2021, Pepsi identified a highly competitive region (the Richmond–Raleigh–Charlotte corridor) where grocery chains were aggressively discounting, creating price-gap risk. Pepsi sought internal views on whether it was feasible to lift grocery prices

in the short term and agreed to a limited Rollback only after concluding it was not feasible due to competitive dynamics and prior commitments.

61.     Pepsi then tried to keep such Rollbacks narrow to avoid a nationwide reaction. After agreeing to a regional Rollback affecting limited products, internal communications expressed the goal of addressing price-gap problems in "key spots" and preventing Walmart from forcing a broader national move. Pepsi simultaneously emphasized that sustained improvement would ultimately require additional rest-of-market actions—i.e., retail price increases outside Walmart.

62.     Rollbacks were the enforcement mechanism behind the Pricing Pact: success in lifting rivals' prices protected Pepsi's wholesale pricing; failure triggered forced wholesale concessions so Walmart could cut retail prices to match the market. Pepsi leadership pressed its teams to show immediate progress raising competitor prices to avoid broader wholesale givebacks that would reduce profitability.

63.     Absent this Pricing Pact, Walmart would have had to match lower competitor pricing and use its buyer power to pursue broad wholesale reductions from Pepsi—just as it did in narrower form through Rollbacks—to compete on price in soft drinks.

64.     Those wholesale and retail reductions would likely have spread throughout the market. Once Walmart lowered prices, competitors would have had strong incentives to match and would have demanded lower wholesale costs to remain profitable. For example, Coca-Cola and Dr. Pepper would have been pressured to respond, driving more competitive category-wide pricing.

65.     Instead, the Pact prevented a market-wide price war. With rivals' retail price competition suppressed, Walmart kept its preferred retail levels, and Pepsi maintained preferred

wholesale levels. That stable foundation then enabled additional, profitable price increases in Pepsi soft drinks.

66.     A review of Pepsi's wholesale pricing illustrates this point. In 2019, Pepsi implemented a wholesale increase broadly but exempted Walmart, which strengthened Walmart's advantaged retail positioning while allowing Pepsi to collect higher wholesale margins elsewhere. Internal messaging describes pricing proposals as oriented not just to cost changes but also to keeping Walmart advantaged through favorable costs/retails to grow both companies' business.

67.     Once the Pact was in place, Pepsi undertook repeated, substantial wholesale increases. Between 2022 and 2023, Pepsi raised wholesale prices by double-digit percentages in each quarter for seven consecutive quarters. Commentators in October 2022 attributed Pepsi's strong results to pricing that increased profitability and to passing costs on to consumers.

68.     Pepsi executives' statements further demonstrate that Pepsi's pricing was insulated. On a 2022 earnings call, Pepsi's CFO stated that Pepsi could take whatever pricing increases it needed; then on a 2023 earnings call, Pepsi's CEO stated Pepsi had been able to raise prices while consumers stayed with the brand.

69.     Retail outcomes track wholesale outcomes. With retail price competition constrained, Walmart allegedly passed through Pepsi's wholesale increases and also imposed additional retail increases beyond pass-through, protected from competitive discipline. During the Class Period, inflation-adjusted soft drink prices increased by more than 70% between 2019 and 2023, including for common two-liter products.

70.     The greatest competitive check on Pepsi would have been its rivals—primarily Coca-Cola and secondarily Dr. Pepper—attempting to win share by undercutting Pepsi's prices.

The Pact reduced the incentive to do so by facilitating tacit coordination in an already concentrated market.

71.     The carbonated soft drink market is dominated by three firms—Pepsi, Coca-Cola, and Dr. Pepper—holding roughly 93% share. In such a market, repeated interaction makes it rational for firms to avoid price wars, producing conscious parallelism: Instead of aggressively competing on price, firms set prices closer to monopoly levels without explicit agreement.

72.     This is proven by Coca-Cola's publicly described approach—"meet-the-competition pricing"—under which it prices on par with other soda brands. By signaling it will not undercut rivals aggressively, Coca-Cola makes it safer for Pepsi to raise prices without losing share to a price-cutting competitor.

73.     The bottling structure also heightens the conditions for coordination. By relying on standardized regional bottling networks, manufacturers increase supply-chain similarity and consolidate pricing decisions in overlapping actors. Competitors sometimes use the same bottlers at the same time in regional markets, enabling monitoring and alignment.

74.     Further, Pepsi's involvement in manufacturing or distributing competitor products created additional opportunities for coordination. For example, Pepsi's purchased major bottlers in 2009 in an effort to continue manufacturing and distributing Dr. Pepper products.  Overlap in distribution relationships can soften incentives to compete and increase coordination opportunities.

75.     The Pact further aided wholesale coordination because retail prices are more observable than wholesale terms. By effectively standardizing Pepsi's retail pricing around Walmart's preferred level, the Pact made Pepsi's price position transparent and easy for rivals to track and match—facilitating alignment at both retail and wholesale.

76.    The Pact shifted the competitive battlefield away from price and toward Walmart's margin protection. Rather than competing by offering Walmart lower wholesale prices, Pepsi allegedly competed by guaranteeing Walmart higher retail margins insulated from discounting—an avenue of competition that avoids triggering a wholesale price war among oligopolists.

77.    A third mechanism was neutralizing large retailers' ability to destabilize oligopoly pricing. Rollbacks show that a dominant retailer can compel discounts that upset industry pricing equilibrium and force rival responses. The Pact reduced the likelihood of such disruptions by preventing the conditions that prompted Walmart to force Rollbacks.

78.    The observed market outcomes are consistent with these mechanisms: instead of a rival undercutting Pepsi and forcing a competitive response, prices rose broadly across brands. This type of category-wide price inflation—without the market share erosion one would expect from competitive undercutting—supports the conclusion that the Pact succeeded in softening competition.

79.    Additionally, Pepsi's pricing trajectory cannot be justified by normal competitive explanations such as rising demand, ordinary cost pass-through, or general inflation.

80.    Demand trends do not support the increases. Per-capita soft drink consumption has been in a long-term decline, dropping more than 15% from its early-2000s peak and falling by more than a gallon per consumer annually during the Class Period. Yet Pepsi allegedly raised wholesale prices by double-digit percentages repeatedly while also reporting double-digit profit increases.

81.    Cost pressures and headline inflation do not fit the magnitude or timing here. Commentators observed Pepsi beat analysts' expectations by raising prices faster than costs during

the pandemic. And when inflation was 3.2% in July and October 2023, Pepsi allegedly implemented price increases of 15% and 11%, respectively.

82.     A December 2025 FinanceBuzz report using CPI data found that from 2020 to 2025: Two-liter bottle prices rose 62% while overall inflation was 25%, and 12-pack can prices rose 89%, more than triple the inflation rate over the same period.

83.     Put plainly, between 2020 and 2025, soda prices rose far faster than inflation across common package sizes, with increases that materially exceeded general CPI growth.

84.     The Pact created a practical retail price floor pegged to Walmart's preferred pricing. By punishing retailers that priced below Walmart—through targeted wholesale increases and reduced promotional support—Pepsi allegedly prevented competitors from maintaining sub-Walmart retail prices even where those prices would have been profitable absent the Pact. Once the floor was established, prices increased not only at targeted retailers (such as Food Lion) but also across other retailers that would otherwise have competed down to those lower price points— directly inflating prices paid by consumers, including the Class.

85.     Walmart's reciprocal commitment—accepting inflated Pepsi wholesale prices and refraining from imposing broader Rollback-driven wholesale cuts—allowed Pepsi to execute additional rounds of significant wholesale price increases over subsequent years. These higher wholesale costs were passed through at retail and compounded by further retail increases, producing still higher prices for consumers, including the Class.

86.     Plaintiffs and members of the Class suffered antitrust injury as a direct and proximate result of Defendants' unlawful conduct. The Pact eliminated intra-brand retail price competition for Pepsi soft drinks by preventing lower-priced retailers from undercutting Walmart's preferred price level. The Pact also suppressed inter-brand competition at the wholesale level by

insulating Pepsi from competitive pressure to lower wholesale prices. As a direct result, Plaintiffs and Class members paid supracompetitive retail prices for Pepsi soft drinks during the Class Period. Plaintiff suffered the type of injuries the antitrust laws were intended to prevent and Plaintiffs' injuries flow directly from the anticompetitive conduct alleged herein. Plaintiffs' injuries were foreseeable and proximately caused by Defendants' agreement to inflate wholesale and retail prices.

### *The Relevant Market*

87.    The relevant product market is bottled soft drinks. Consumers do not view other products as reasonable substitutes. Alcoholic beverages are not interchangeable due to their intoxicating effects. Non-bottled options such as fountain drinks are typically sold in different locations and are not similarly transportable or storable. Bottled soft drinks have no meaningful non-beverage substitutes for virtually any purpose.

88.    The relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico (together with the product market, the "Relevant Market").

89.    A hypothetical monopolist in bottled soft drinks could profitably impose a small but significant non-transitory price increase without prompting enough substitution to make the increase unprofitable.

90.    Defendants' ability to elevate prices profitably and persistently supports the conclusion that adequate substitutes are lacking and bottled soft drinks constitute a relevant antitrust market.

### *The Defendants' Power in the Relevant Market and the Damage Their Pricing Pact Inflicted on Consumers*

91.     Pepsi holds substantial power in the Relevant Market: it is the second-largest manufacturer with roughly one-third of sales, and together with Coca-Cola and Dr. Pepper it participates in a triopoly controlling over 90% of U.S. carbonated soft drink sales. Entry into the Relevant Market is deterred by durable, multibillion-dollar advantages in brand recognition and bottler relationships that are essential to mass retail reach.

92.     Walmart likewise wields substantial power in the Relevant Market. Walmart operates more than 4,700 U.S. stores, maintains near-ubiquitous proximity to consumers, and has substantial buyer leverage because it captures basket shoppers who are unlikely to leave to buy soft drinks elsewhere. A supplier who loses Walmart loses a large segment of retail customers entirely, making Walmart indispensable to suppliers.

93.     Direct evidence of combined market power exists here:  including Defendants' ability to impose and sustain prices above competitive levels, as well as Pepsi's repeated large price increases starting in 2019 and which are not explained by ordinary competitive forces and were enabled by the Pricing Pact.

94.     Moreover, inter-brand competition did not constrain Pepsi. Rather, the Pact softened price competition among Pepsi, Coca-Cola, and Dr. Pepper, made Pepsi's price moves easier to observe and follow, and reduced Walmart's capacity to trigger a price war by forcing broad wholesale concessions.

95.     High barriers to entry—including entrenched bottler networks, exclusive territorial distribution agreements, massive advertising expenditures, and retailer must-carry dynamics— prevent meaningful competitive entry. The combined Market Power of Pepsi and Walmart enabled them to implement and sustain the Pact.

96.     By accepting Pepsi's inflated wholesale prices and helping police rival retail pricing, Defendants caused Walmart's retail competitors to face elevated wholesale costs for Pepsi products, undermining those retailers' ability to compete at the shelf.

97.     The Pricing Pact also increased Pepsi's Market Power by reducing the threat that rivals would undercut Pepsi's increases, increasing the likelihood competitors would match price moves, and reducing the risk Pepsi would lose share even while charging supracompetitive prices.

98.     Pepsi used the Pact to implement a series of anticompetitive wholesale price increases beginning in 2019 and accelerating in 2022–2023, including double-digit quarterly increases for seven consecutive quarters. Executive remarks reflecting an ability to take whatever increases were needed are evidence that competitive discipline was weakened. As a result, these wholesale increases were passed through to consumers at retail, raising prices paid by Plaintiffs and the Class.

99.     The magnitude and persistence of those increases exceed what would be expected from general inflation or ordinary cost pressures in a competitive market.

100.    The Pact reduced the likelihood Walmart would use its buyer power to force wholesale cuts that might destabilize oligopolistic pricing. Rollbacks prove Walmart can compel concessions that risk market-wide competitive responses. By suppressing the conditions that lead to Rollbacks, the Pact preserved elevated pricing.

101.    The Pact restrained retail competition among Pepsi-selling retailers by preventing would-be discounters from pricing below Walmart. Retail prices were inflated, because efficient retailers could not profitably undercut Walmart and other retailers were not forced to match lower prices that would otherwise emerge.

102.    The cumulative result was reduced competition at both wholesale and retail levels—impaired intra-brand retail rivalry, softened inter-brand competition, sustained supracompetitive wholesale pricing, and inflated retail pricing.

103.    Unfortunately, consumers ultimately bore these increases in the form of overcharges.

### *Tolling of Statutes of Limitations*

104.    The Pricing Pact constituted a continuing violation throughout the Class Period, with repeated overt acts that invaded Plaintiffs' and Class Members' interests.

105.    Defendants repeatedly discussed the Pricing Pact, adjusted it in response to Walmart's price movements, agreed to additional wholesale increases, and enforced their understanding against retailers that attempted to undercut Walmart's retail prices for Pepsi soft drinks.

106.    Each purchase at an inflated price during the Class Period inflicted a new injury, because consumers paid overcharges each time they bought Pepsi soft drinks.

107.    Plaintiffs' claims are timely under the applicable statutes of limitations. The Pact constitutes a continuing violation of the antitrust and consumer protection laws. Each supracompetitive sale of Pepsi soft drinks during the Class Period constitutes a new and independent overt act that inflicted new and accumulating injury. Defendants fraudulently concealed the existence and scope of the unlawful agreement. The Pact was implemented through private negotiations, confidential pricing policies, and internal directives not publicly disclosed. Plaintiffs and Class members exercised reasonable diligence and could not have discovered the anticompetitive conduct earlier. Accordingly, the limitations period was tolled under the doctrines of fraudulent concealment, equitable tolling, and/or equitable estoppel.

*The Effect of Defendants' Conduct on Intrastate and Interstate Commerce*

108.    Defendants' conduct substantially affected interstate commerce. Pepsi soft drinks are manufactured, distributed, and sold across state lines throughout the United States. The Pact distorted pricing in multiple states and directly affected trade and commerce among the several states. The volume of commerce impacted exceeds hundreds of millions of dollars annually.

## V.    CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure and seeks certification of a class (the "Class") defined as follows:

> All persons and entities in Repealer Jurisdictions who indirectly purchased Pepsi soft drinks for their own use and not for resale, at any time during the period from January 1, 2018 through at least the filing date of this Complaint.

110.    Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are: Any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

111.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Class Members number in the millions.

112.    **Typicality.** Plaintiffs' claims are typical of the claims of members of the Class, who are similarly affected by Defendants' wrongful conduct in violation of the laws complained of herein. Plaintiffs and all members of the Class were injured in the form of overcharges caused by Defendants' conduct.

113.    Plaintiffs' interests do not conflict with those of members of the Class.

114. **Commonality.** Questions of law and fact common to the members of the proposed Class include:

1. Whether Defendants agreed to increase, fix, or stabilize the prices of Pepsi soft drinks;

2. The nature, scope, and extent of Defendants' Pact;

3. Whether that Pact violates the Sherman Act and relevant state laws;

4. Whether retail competition for sales of Pepsi soft drinks was impaired by Defendants' Pact;

5. Whether Plaintiffs and Class Members were injured by Defendants' Pact;

6. The appropriate measure of classwide damages for members of the Class; and

7. Whether injunctive relief to prevent Defendants' Pact from recurring is appropriate and, if so, what injunctive relief is appropriate.

115. **Predominance.** The common issues above predominate over any issues affecting only individual Class Members.

116. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by some of the individual Class Members may be relatively small, the expense and burden of individual litigation makes it impractical for individual members of the Class to redress the wrongs done to them. Furthermore, litigating millions of individual cases would inevitably lead to inconsistent rulings and results, burden the judicial and legal system, and magnify the delay and expense to all parties and the court system through repeated litigation and trial of the same factual and legal issues.

## VI.    COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS

117.    To the extent required by applicable state law, Plaintiffs have complied with all pre-suit notice and demand requirements. Any such requirements are either satisfied, excused, or inapplicable because Defendants' conduct was ongoing, concealed, and part of a continuing course of unlawful conduct. Plaintiffs reserve the right to provide supplemental notice as required by specific jurisdictions.

## VII.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3) (ON BEHALF OF RESIDENTS IN REPEALER JURISDICTIONS FOR DECLARATORY AND EQUITABLE RELIEF)

118.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs.

119.    Defendants violated 15 U.S.C. Sections 1 and 3 by entering into, furthering, and/or enforcing an unreasonable restraint of trade. More specifically, Pepsi agreed with Walmart to fix, increase, inflate, or stabilize prices of Pepsi soft drinks.

120.    Defendants' Pact reduced intra-brand competition by eliminating price competition retailers that compete with Walmart in the retail market.

121.    Defendants' Pact also stifled inter-brand competition between Pepsi, Coca-Cola, and Dr. Pepper.

122.    The market for bottled soft drinks is a relevant antitrust market. No reasonable substitutes for bottled soft drinks exist. Retail customers of bottled soft drinks do not view bottled soft drinks as reasonably interchangeable with other types of beverage, such as alcoholic drinks or non-bottled soft drinks.

123.    Pepsi's one-third share of the U.S. bottled soft drinks market constitutes market power. Pepsi's Market Power is further enhanced by the triopoly that exists in the soft drink industry. Significant entry barriers exist in the bottled soft drink market, due to the triopoly manufacturers' multibillion dollar investments into durable advantages in brand recognition and bottling relationships.  These significant barriers to entry prevent competitors from reaching the mass retail market.

124.    Pepsi's Pact with Walmart, the largest retailer in the United States, only served to enhance its market power.

125.    As the largest retailer in the United States, with thousands of  local retail stores, Walmart has significant Market Power.

126.    Walmart wielded this Market Power over Pepsi to obtain Pepsi's agreement to limit price competition from other retailers.

127.    This Pricing Pact had substantial price effects in the soft drink market. Defendants' Pact substantially increased the wholesale price of Pepsi's bottled soft drinks.  These price increases were absorbed by retail customers of bottle soft drinks, including Class Members. The Pact also stifled competition among retailers which directly led to higher retail prices for Pepsi's soft drinks.

128.    No procompetitive justification exists for Defendants' Pricing Pact. Pepsi soft drinks are not specialized products and no free-rider justifications exist for the Pricing Pact.

129.    Defendants' Pact violates the rule of reason under a "quick look" analysis because the anticompetitive effect of their Pact is plain and obvious.

130.    Defendants' Pact violates the full-blown rule of reason because the Pact harms competition without providing any benefit to any relevant market.

131.    As a result of Defendants' Pact, prices for Pepsi soft drinks were inflated above competitive levels in the United States.

132.    As a result of Defendants' Pact, Plaintiffs and Class Members have been injured in their businesses and property in that they have paid more for Pepsi soft drinks than they otherwise would have paid in the absence of that conduct.

133.    Plaintiffs and Class Members seek injunctive relief and attorneys' fees and costs under the Sherman Act.

**VIOLATIONS OF STATE ANTITRUST LAWS**

134.    The following Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the Class.

135.    Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

**COUNT II**
**VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,**
**KAN. STAT. ANN. §§ 50-101 *et seq*.**

136.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs 1-117.

137.    The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

138.    Kansas Restraint of Trade Act provides that "[a] trust is a combination of capital, skills, or acts by two or more persons . . . [t]o create or carry out restrictions in trade or commerce, or aids to commerce, or to carry out restrictions in the full and free pursuit of any business

authorized or permitted by the laws of this state." Kan. Stat. Ann. §50-101. It further states that "[n]o person…within the state of Kansas shall conspire or combine with any other persons, within or without the state for the purpose of monopolizing any line of business." Kan. Stat. Ann. § 50-132 (2016).

139.    By reason of the conduct alleged herein, Defendants have violated Kan. Stat. Ann. §§ 50-101, *et seq*.

140.    Plaintiff Eaton and members of the Class purchased Pepsi soft drinks within the State of Kansas during the Class Period.  But for Defendants' conduct set forth herein, the price of the Pepsi soft drinks purchased by Plaintiff Eaton in Kansas during the Class Period would have been lower, in an amount to be determined at trial.

141.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann. § 50-161(b).

142.    Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of Pepsi soft drinks, increasing the price of Pepsi soft drinks, preventing competition in the sale of Pepsi soft drinks, in a manner that precluded free and unrestricted competition in the sale of Pepsi soft drinks, in violation of Kan. Stat. Ann. §§ 50-101, *et seq*.

143.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Kansas.

144.    Defendants' unlawful conduct substantially affected Kansas' trade and commerce and Defendants' unlawful conduct occurred in substantial part in Kansas by fixing the prices charged by retailers for Pepsi soft drinks in Kansas.

145.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

146.     By reason of the foregoing, Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Kansas and are entitled to all forms of relief, including actual damages, recovery of treble damages, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT III
## VIOLATION OF KANSAS CONSUMER PROTECTION STATUTE, KAN. STAT. ANN., §§ 50-623, *et seq.*

147.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs 1-117.

148.     Plaintiffs and members of the Class purchased Pepsi soft drinks for personal, family, or household purposes.

149.     By reason of the conduct alleged herein, Defendants have violated Kan. Stat. Ann. §§ 50-626-627.

150.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Kansas.

151.     Defendants' conduct constituted deceptive or unconscionable act or practice in connection with consumer transactions in Kansas.

152.     Defendants' unlawful conduct substantially affected Kansas's trade and commerce.

153.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured by paying an overcharge for Pepsi soft drinks purchased in the State of Kansas during the Class Period.

154.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Kan. Stat. Ann. §§ 50-623, *et seq.*

**COUNT IV**
**VIOLATION OF ALABAMA RESTRAINT OF TRADE OR PRODUCTION ACT**
**Ala. Code § 8-10-1 (2024)**

155.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs 1-117.

156.    Defendants entered into unlawful restraints of trade in violation of Ala. Code §§ 8-10-1, *et seq.*

(a) During the Class Period, Defendants entered into and engaged in continuing unlawful contracts or combinations that unreasonably restrained the trade or production described above in violation of the Ala. Code § 8-10-3.

(b) Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Alabama; (ii) prices of products or services were raised to artificially high levels throughout Alabama; (iii) Plaintiff Lopez and members of the Class were deprived of free and open competition; and (iv) Plaintiff Lopez and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(c) During the Class Period, Defendants' illegal conduct substantially affected commerce in Alabama.

(d) Under Alabama law, indirect purchasers have standing to maintain an action based on the facts in this Complaint. Ala. Code § 6-5-60(a).

(e) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Lopez and members of the Class have been injured in their business and property and are threatened with further injury.

(f) By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Ala. Code § 8-10-3.

(g) Accordingly, Plaintiff Lopez and members of the Class seek legal relief under Ala. Code § 6-5-60(a)., including the sum of $500 and all actual damages.

## VIII.    PETITION FOR RELIEF

Plaintiffs petition for the following relief:

a.   a determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

b.   a determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act and the relevant Repealer Jurisdictions' laws;

c.   a judgement and order requiring the Defendants to pay damages to Plaintiffs and members of the proposed Class;

d.   an order enjoining the Defendants from engaging in further unlawful conduct;

e.   an award of attorneys' fees and costs;

f.   an award of pre- and post- judgement interest on all amounts awarded; and

g.   such other and further relief as the Court deems just and equitable.

IX.    **JURY TRIAL DEMAND**

Plaintiffs and members of the Class demand a trial by jury on all claims so triable under

Federal Rule of Civil Procedure 38(b).

Dated:  March 12, 2026                    Respectfully submitted,


/s/ Arvind Khurana
Arvind Khurana, Esq.
16 Madison Square West, 11th Floor
New York, NY  10010
Telephone: (212) 847-0145
akhurana@khuranapc.com

Eric D. Barton (*Pro Hac Vice* application
forthcoming)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave. Ste. 300
Kansas City, MO 64112
Telephone: (816) 701-1100
ebarton@wcllp.com

*Counsel for Plaintiffs*